Filed 9/21/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LOS ANGELES COLLEGE FACULTY GUILD LOCAL 1521,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LOS ANGELES COMMUNITY COLLEGE DISTRICT,<br><br>    Defendant and Respondent. | B313085<br><br>(Los Angeles County<br>Super. Ct. No. 20STCP03557) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed.

Lawrence Rosenzweig for Plaintiff and Appellant.

Atkinson, Andelson, Loya, Ruud & Romo, Joshua E. Morrison and Rebeca Delatorre for Defendant and Respondent.

————————————

The Los Angeles College Faculty Guild (Guild) represents faculty at the nine community colleges in the Los Angeles Community College District (District).  The Guild appeals the trial court's judgment of dismissal of its petition to compel arbitration of grievances relating to the District's decision to cancel all remedial for-credit English and mathematics courses two levels below transfer level.  The Guild contends the court erred in determining it, rather than an arbitrator, should decide the issue of arbitrability and further erred in finding the grievances non-arbitrable.  The Guild maintains the grievances involve violations of several provisions of the collective bargaining agreement (CBA) between the parties and so are subject to the arbitration provision of that agreement.  We affirm the trial court's order denying the motion and petition and its subsequent judgment of dismissal.

## BACKGROUND

In 2018, the California Legislature passed Assembly Bill No. 705 (2017–2018 Reg. Sess.) (Assembly Bill 705) in response to concerns that too many students were being referred to remedial courses upon entering the community college system.  The Legislature found that placement in such remedial courses discouraged students from pursuing a college education and made them less likely to achieve their educational goals and to complete a degree, certificate or transfer outcome within a six-year period.[1]  (Stats. 2017, ch. 745, § 1.)

---

[1]  The trial court granted the District's request to take judicial notice of the 2018 legislative history of Assembly Bill 705.  On our own motion, we also take judicial notice of this legislative history.  (Evid. Code, § 452.)

2

Assembly Bill 705 amended Education Code section 78213 to provide that "[a] community college district or college shall maximize the probability that a student will enter and complete transfer-level coursework in English and mathematics within a one-year timeframe." (Ed. Code, § 78213, subd. (d)(1)(A).) The amendment also specified that a "community college district or college shall not require students to enroll in remedial English or mathematics coursework that lengthens their time to complete a degree" unless a placement assessment which included their high school record "shows that those students are highly unlikely to succeed in transfer-level coursework." (*Id.*, subd. (d)(2).) The amendment provided that a "community college district or college may require students to enroll in additional concurrent support . . . during the same semester that they take a transfer-level English or mathematics course, but only if it is determined that the support will increase their likelihood of passing the . . . course." (*Ibid.*)

In response to Assembly Bill 705, the District and each member college consulted with experts and formulated a model compatible with this goal. According to a declaration filed by the deputy chancellor for the District, some of the models included remedial for-credit courses one level below transfer, but none included for-credit courses which were two levels below transfer. For reasons which are not clear from the record, the colleges' Fall 2019 schedules included for-credit remedial courses two levels below transfer. The deputy chancellor described the inclusion of these courses as "inconsistent" with the colleges' own models and the implementation plan for Assembly Bill 705.

The District removed those courses from the Fall 2019 schedule and the chancellor sent an email to all faculty explaining that the courses had been removed because they were inconsistent with the implementation plan for Assembly Bill 705. The email explained that " '[f]or students desiring to gain content mastery below one level below transfer, they will be directed to non-credit course offerings, the English Writing Center, math labs, and other academic supports.' "

The Guild at eight of the District's nine colleges filed grievances. When the grievances were denied, the Guild submitted the matter to arbitration pursuant to the grievance procedure of the CBA. The District refused to arbitrate, contending the claims in the grievances were outside the scope of representation under the Educational Employment Relations Act (EERA) (Gov. Code, § 3540 et seq.)[2] and also outside the scope of the CBA.

The Guild filed a motion and petition to compel arbitration. The trial court denied both and dismissed the action. The court found the CBA did not delegate the arbitrability decision to the arbitrator, and so it was for the court to decide. The court found the claims were outside the scope of representation under EERA and so were not arbitrable. The court also found the Guild had not raised arbitrable issues under Articles 12(F), 32(I) and 17(D)(1) of the CBA. Put differently, the court found cancellation of the courses did not violate those articles. This appeal followed.

---

[2] Further undesignated statutory references are to the Government Code.

## DISCUSSION

A.   <u>Arbitrability Was an Issue for the Court</u>.

The Guild contends the trial court erred in finding the issue of arbitrability should be decided by the court and not by the arbitrator.  It is undisputed the CBA does not contain an express delegation of arbitrability to the arbitrator.  The Guild claims the parties' prior practice of allowing the arbitrator to decide arbitrability and the broad language of Article 28(G)(4) of the CBA, together with *Steelworkers v. Warrior & Gulf Co.* (1960) 363 U.S. 574 (*Warrior & Gulf*) and *Southern California Dist. Council of Laborers v. Berry Constr., Inc.* (9th Cir. 1993) 984 F.2d 340, effectuate a delegation.

1.   *There Is No Relevant Evidence of Past Practices.*

The Guild contends it is undisputed that "in previous arbitrations, the arbitrator has decided arbitrability."  The Guild has not provided a record citation to support this broad claim, let alone details of those arbitrations.  Without such information, past practices are meaningless.  Similarly, the Guild's reference to "a well-established arbitration process that the parties have operated for many years" is unsupported by citation to the record and lacks any detail, rendering it meaningless.[3]

---

[3]   The Guild states that "Darrell Eckersley, the Guild Grievance Representative, has been involved in 'approximately 50 arbitrations' between the parties."  The Guild cites to pages 383 and 384 of the Clerk's Transcript to support this claim, but this citation is to respondent's Answer to the Petition to Compel Arbitration, which does not mention Eckersley or the involvement of any Guild representative in arbitration.  Thus, the Guild's claim about common law also lacks a factual foundation.

This lack of information about past practices alone belies the Guild's reliance on *Warrior & Gulf*. While that case holds that the "common law" of the industry and the shop is incorporated into a collective bargaining agreement, the case was decided in 1960 and involved steel workers. The Guild has not shown what that common law is in its industry or shop today. Further, the Court there made clear that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (*Warrior & Gulf, supra,* 363 U.S. at p. 582.)

As the United States Supreme Court has more recently explained, courts "should not assume that the parties agreed to arbitrate arbitrability unless there is '*clea[r] and unmistakabl[e]*' evidence that they did so." (*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944, italics added.) The presumption in favor of arbitration, which applies when a valid arbitration agreement is silent or ambiguous as to the arbitrability of a particular dispute, does *not* apply to "silence or ambiguity" with respect to the delegation question. (*Id.* at pp. 944–945.) Rather, "the law reverses the presumption." (*Id.* at p. 945.) Thus, the court is presumptively the appropriate entity to review the question of arbitrability when the parties "did not clearly agree to submit the question of arbitrability to arbitration." (*Id.* at p. 947.) The Court subsequently confirmed that arbitration in commercial and labor cases should be analyzed using the same initial framework. (*Granite Rock v. Intern. Broth. of Teamsters* (2010) 561 U.S. 287, 296 (*Granite Rock*) (["It is well settled in both commercial and labor cases that whether parties have agreed to 'submi[t] a particular dispute to arbitration' is typically an ' " issue for judicial

6

determination." ' "].)  The Court indicated this would be true of the delegation question as well, that is, the issue of whether the parties agreed to arbitrate arbitrability.  (*Id.* at p. 297, fn. 5.)

2. *The Language of the CBA Does Not Delegate the Issue of Arbitrability to the Arbitrator.*

The Guild also relies on Article 28(4)(G) of the CBA, which provides: "The arbitrator's decisions shall be limited to a specific finding regarding the alleged misinterpretation, misapplication or violation of a specific item of this Agreement or of a written rule or regulation of the District."  The Guild contends "similar language" was found to authorize the arbitrator to determine questions of arbitrability in *Southern California Dist. Council of Laborers v. Berry Constr., Inc.*, *supra*, 984 F.2d 340.

The Ninth Circuit has now rejected the proposition that a broad arbitration clause is sufficient to delegate the issue of arbitrability to the arbitrator.  As the Ninth Circuit recently acknowledged, a number of its decisions which predated *First Options* "constru[ed] a broad arbitration clause as conferring authority on the *arbitrator* to decide arbitrability '[as] an act of legitimate contract interpretation.' "  (*SEIU Local 121RN v. Los Robles Regional Med. Ctr.* (9th Cir. 2020) 976 F.3d 849, 853 (*Los Robles*).)  These decisions culminated in *United Broth. of Carpenters # 1780 v. Desert Palace* (9th Cir. 1996) 94 F.3d 1308 (*Desert Palace*), in which the Ninth Circuit "concluded that the broad arbitration clause [before it], which covered matters of interpretation and application of the agreement and did not explicitly exclude arbitrability or jurisdictional issues, evinced the parties' agreement to have an arbitrator decide arbitrability." (*Los Robles,* at p. 853.)  The *Los Robles* Court concluded *Desert Palace* was inconsistent with *First Options* and *Granite Rock* and

7

expressly found *Desert Palace* had been abrogated. (*Los Robles*, at p. 861.) As the Ninth Circuit explained, under those controlling United States Supreme Court precedents, "we must determine whether there is 'clear and unmistakable' evidence of the parties' intent to have an arbitrator—rather than the court—decide whether the grievance is arbitrable. Under Article 38 of the CBA, an arbitrator is tasked with resolving any 'dispute or disagreement involving the interpretation, application or compliance with specific provisions of [the CBA].' The CBA is otherwise silent as to the arbitrator's authority to determine its own jurisdiction, and SEIU does not provide any other evidence of an agreement to have an arbitrator decide that issue. [¶] . . . Without 'clear and unmistakable' evidence, then, we rely on the well-settled principle 'that whether parties have agreed to submit a particular dispute to arbitration is typically an issue for judicial determination.' *Granite Rock*, 561 U.S. at 296, 130 S.Ct. 2847 (citations, quotation marks, and alteration marks omitted). We therefore hold that the district court is responsible for determining whether the grievance filed by SEIU is arbitrable." (*Los Robles,* at p. 861.)

B.    Arbitrable Issues Are Circumscribed by EERA.

The arbitration agreement is part of a collective bargaining agreement and is therefore subject to the EERA. (*United Teachers of Los Angeles v. Los Angeles Unified School Dist.* (2012) 54 Cal.4th 504, 512 (*UTLA*) [EERA covers collective bargaining for grades K-14].) "Government Code section 3548.5 provides: 'A public school employer and an exclusive representative who enter into a written agreement covering matters within the scope of representation may include in the agreement procedures for final and binding arbitration of such disputes as may arise involving

the interpretation, application, or violation of the agreement.' The statute makes clear that authorization to arbitrate is predicated on the existence of a collective bargaining agreement 'covering matters within the scope of representation.' " (*UTLA,* at p. 515.)  "In the EERA, as in federal labor law, collective bargaining arbitration is part of a system of workplace self-government that allows employees to join organizations that represent them 'in their professional and employment relationships with public school employers' and afford them 'a voice in the formulation of educational policy.'  (Gov. Code, § 3540.)  However, because labor relations in this area significantly intersect with educational goals affecting society as a whole, the Legislature has limited the scope of such self-governance by withdrawing from collective bargaining certain matters in the Education Code.  The Legislature has decided that those matters should be exclusively management prerogatives, subject only to the constraints of statute. . . . *[T]he EERA makes clear that a grievance is inarbitrable when it arises from a matter . . . on which collective bargaining is statutorily preempted.*" (*UTLA,* at pp. 519–520, italics added.)

Under the EERA, "[t]he scope of representation shall be limited to matters relating to wages, hours of employment, and other terms and conditions of employment.  'Terms and conditions of employment' mean health and welfare benefits . . . , leave, transfer and reassignment policies, safety conditions of employment, class size, procedures to be used for the evaluation of employees, organizational security, . . . procedures for processing grievances . . . , the layoff of probationary certificated school district employees . . . , and alternative compensation or benefits for employees adversely affected by pension limitations."

9

(§ 3543.2, subd. (a)(1).) Conversely, "[u]nder the EERA the 'definition of educational objectives, the determination of the content of courses and curriculum, and the selection of textbooks to the extent such matters are within the discretion of the public school employer under the law' are matters on which the exclusive representative has only the right to consult." (*San Mateo City School Dist. v. Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 862; see § 3543.2, subds. (a)(3) & (a)(4).)

The decision to cancel remedial for-credit English and mathematics courses two levels before transfer level is, in essence, a decision about the content of courses and curriculum. Put differently, it is a decision not to offer courses which contain such content. Thus, it is a matter within the discretion of the district, and so not within the scope of representation. It is therefore not an arbitrable issue.

As the District points out, the Public Employment Relations Board (PERB) treated a community college's decision to cancel summer school classes as an unenumerated right within the meaning of section 3543.2, subdivision (a)(4) which provides: "All matters not specifically enumerated [in the scope of representation] are reserved to the public school employer and may not be a subject of meeting and negotiating, except that this section does not limit the right of the public school employer to consult with any employees or employee organization on any matter outside the scope of representation." (§ 3543.2, subd. (a)(4); *Mt. San Antonio Community College District* (1983) PERB Dec. No. 297 [7 PERC ¶ 14109] (*Mt. SAC*).) The Administrative Law Judge (ALJ) in that case applied PERB's three-pronged test to the cancellation right and concluded the "decision as to which classes to cancel, and on what basis is therefore a non-negotiable

10

management prerogative." (*Mt. SAC,* at p.46.)[4]  PERB adopted that finding.  (*Id*. at p. 2.)  Thus, even if we were to view the right

[4]     That test "first analyzes: (1) whether the subject logically and reasonably relates to an 'enumerated' term and condition of employment [under EERA]; next (2) whether the subject is of such concern to both management and employees that a conflict is likely to occur which can best be resolved in the mediatory arena of collective bargaining; and (3) whether such collective bargaining would significantly abridge the employer's freedom to exercise those managerial prerogatives, relating to matters of fundamental policy and economic consideration 'essential to the achievement of the [employer's] mission.' "  (*Mt. SAC, supra,* PERB Dec. No. 297 at pp. 42–43.)

     Applying this test, the ALJ concluded the "decision as to which classes to cancel, and on what basis is therefore a non-negotiable management prerogative."  (*Mt. SAC, supra,* PERB Dec. No. 297 at p. 46.)  In essence, the ALJ recognized that faculty members had an interest in teaching these classes, which were similar in almost every way to classes during the regular school year, but offered the possibility of additional compensation and benefits, and so involved enumerated rights.  At the same time, the ALJ concluded the decision to cancel courses or an entire session and "to reduce the kind and number of courses offered" (*id*. at p. 45) was a management prerogative "derived from the need to efficiently manage the work force and make policy determinations in the face of fiscal changes.  The overall goal to provide a district's students and constituents with an educational program encompassing the total needs of the student body must be balanced against the cost of providing these programs and their relative importance in the overall mission of the particular school district.  These are considerations which inherently belong to the management of the school district.  [Citation.]  [W]hile teachers may have an interest in teaching the courses offered, the decision whether to offer courses is not easily

11

to determine whether to offer remedial courses more narrowly as the right to cancel remedial courses and treat it simply as a right which is not enumerated in the statutory scope of representation, such a posture would not assist the Guild.  The decision would be a managerial one outside the scope of representation and so non-arbitrable.

C.    <u>The Guild Has Not Shown Arbitrable Issues under the Specified Provisions of the CBA</u>

As PERB recognized in *Mt. SAC*, while the decision to cancel courses is a management decision, such cancellations can affect matters in a collective bargaining agreement which are within the EERA scope of representation, notably pay and benefits.  (*Mt. SAC*, *supra*, PERB Dec. No. 297 at p. 3.)  Accordingly, we consider the Guild's claims that the cancellation of the remedial courses violated certain provisions of the CBA.  As discussed in more detail below, we do not agree that a reasonable reading of the Articles at issue shows they apply to the course cancellations at issue.  Assuming for the sake of argument that the Articles can be understood to apply to these course cancellations, they would be outside the scope of representation and so non-arbitrable.  (*UTLA, supra,* 54 Cal.4th at pp. 519–520 ["EERA makes clear that a grievance is inarbitrable when it arises from a matter  . . . on which collective bargaining is statutorily preempted"].)

---

resolved by the give and take of collective bargaining." (*Id.* at pp. 45–46)

12

1.    *Article 12(F).*

The Guild contends the trial court erred by finding that Article 12(F) was not the issue involved here. The Guild contends the issue was raised in the Pierce College grievance. The court in fact found "there is no issue raised here that fits into this category." The court was correct.

As the Guild points out, Article 12(F) was cited in the grievance, but as the grievance itself shows, the substance of the article did not apply. Article 12(F) provides: "Responsibility for canceling classes because of low enrollment or low attendance shall rest with the appropriate vice president or designee, after consultation with the department chair and the faculty member involved whenever possible."

There is nothing in the record on appeal to suggest that the classes at issue were cancelled due to low enrollment or low attendance. The grievance refers to a memo from the chancellor about class cancellation. That memo was sent on the first day of registration for fall classes, and states that classes are being cancelled as a result of an Assembly Bill 705 compliant model. It makes no mention of low enrollment, and the timing precludes any inference that low enrollment was a reason for the cancellation.

2.    *Article 32(I)*

The Guild contends the court erred in finding there was "no issue raised here which fits into this category" of Article 32(I). The Guild points out the Pierce College grievance states: "Article 32.I of the [CBA] stipulates that 'The District and the AFT recognize that decision-making in an academic environment is generally made via committee.'" The Guild contends the District's cancellation of courses was a "departure from the

13

normal procedure" of committee decision-making which had to be justified.

Article 32 contains six numbered subsections concerning committees. Article 32(I) is the first subsection, making the first sentence of Article 32(I) the first sentence of the entire article. Article 32(I) is the only numbered subsection without a heading, indicating it contains introductory or prefatory information. In this context, the first sentence is simply acknowledging the major role committees play in academic decision-making. It is descriptive, not directive.

The remainder of Article 32(I) states: "Committees may address union issues of wages, hours, and working conditions, or shared governance concerns such as facilities oversight, educational planning, resource allocation, and long-term strategic goal-setting. Committees that are negotiated as part of [the CBA] shall include AFT and Academic Senate participation as designated. All committees should operate under the principles of participatory decision-making. In each instance where AFT committee membership is designated, the AFT chapter president shall select those faculty member(s) to serve. In each instance where Academic Senate committee membership is designated, the Academic Senate President shall select those faculty member(s) to serve."

Read as a whole, then, Article 32(I) conveys that since committees play an important role in academic decision-making, all committees created pursuant to the [CBA] must have AFT (Guild) and Academic Senate representatives on them. It is not reasonable to understand Article 32(I) as requiring all decision-making to be made by committee, or even all course-related decision-making. The list of optional and required committees is

found later in the Article, and there is no information in the grievance about the existence or scope of any of those committees.[5]

The court correctly focused on the latter (and longer) part of the Article, noting that it provides that committees "shall include AFT and Academic Senate participation as [designated]." The court was correct that the focus of the Article is the participation of the AFT and Academic Senate in committees, and that there were no claims that those entities were prevented from participation in the committees.

3.    *Article 17(D)(1)(b)*

The Guild contends the trial court erred in rejecting its interpretation of Article 17(D)(1)(b) based on speculation that that interpretation would permit department chairs to schedule any sort of class they wished, even classes outside their department.

Article 17(D)(1)(b) indicates department chairs are responsible for "preparing class schedules." Common definitions of "schedule" are "a procedural plan that indicates the time and

---

[5]    Immediately before citing Article 32(I), the grievance states: "[T]he Chancellor's directive contravenes the shared governance agreement between the Board of Trustees and the District Academic Senate, as related to educational program development, degree and certificate requirements, policies on student preparation and success, and curriculum." This statement suggests that it is the Academic Senate which has the responsibility for educational program development and curriculum. The Academic Senate, however, is not a party to this action, and the shared governance agreement is not before us.

15

sequence of each operation"[6] and "a list of the times when events are planned to happen, for example the times when classes happen."[7]  Thus, the most reasonable understanding of the phrase "preparing class schedules" is "setting the days and times for classes."

The Guild is not complaining that the remedial courses were scheduled for inappropriate days or times.  Instead, the Guild makes much of the fact that the courses were cancelled after they were placed on the tentative schedule for Fall 2019.  The Guild, however, does not assert any schedule-related harm from the timing of the decision.  It does not, for example, complain that the chairs were not permitted to reschedule remaining courses in light of schedule openings arising from the cancellations.  Thus, the trial court's conclusion that there was no arbitrable claim under Article 17(D)(1)(b) was correct.

4.     *Article 4*

The Guild points out, correctly, that the trial court did not consider whether the violation of Article 4, mentioned in the Mission College grievance, was arbitrable.  That grievance simply asserts, without supporting analysis, argument or legal citations, that the cancellation of the courses "violates the rights of faculty to '. . . guarantee freedom of learning to students.' "  In this

---

[6]     Merriam-Webster Dictionary Online (2022) <https://www.merriam-webster.com/dictionary/schedule> [as of Sept. 20, 2022], archived at <https://perma.cc/CJC2-JNFQ>.

[7]     Cambridge Dictionary Online (2022) <https://dictionary.cambridge.org/us/dictionary/ english/schedule> [as of Sept. 20, 2022], archived at <https://perma.cc/H5V6-B9JD>.

16

appeal, the Guild contends, without supporting analysis, argument or legal citations, that the faculty is entitled to guarantee "freedom of learning to the students" by dictating that the best method for "the development of a segment of the student population" is enrollment in for-credit courses two levels below transfer. The meaning of "freedom of learning" is not obvious, and its relationship to specific remedial courses is even less clear. The Guild has therefore forfeited this claim. "We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.'" (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 [" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' "].)

5. *Article 6(E)*

The Guild points out, correctly, that the trial court did not consider whether the violation of Article 6(E), mentioned in the Mission College grievance, was arbitrable. The grievance states the course cancellation violates the provision of Article 6(E) that "[b]oth parties agree to comply with state and/or federal laws." The grievance appears to be based on the premise that Article 6(E) is violated whenever any applicable state or federal law is violated, and therefore all claims that the District violated a law are arbitrable. More specifically, the grievance claims Assembly Bill 705 did not require the course cancellations and Education Code section 66010.4 required community colleges to provide remedial instruction.

17

This is an extremely broad reading of the sentence, which is not a reasonable one when the sentence is read in context. Article 6 contains "General Provisions" of the CBA and subsection (E) provides in full: "This Agreement is not intended to modify or replace by any of its terms the rights of every faculty member in the bargaining unit under the law. Both parties agree to comply with state and/or federal laws." In this context, the provision is simply clarifying that faculty members are not giving up any rights under the law by entering into the CBA and the District is agreeing to follow applicable state and federal law concerning the rights of its faculty members.

Education Code section 66010.4 itself does not confer any rights on faculty members so it cannot be invoked by Article 6(E). Subdivision (a)(2), quoted in the grievance, provides: "In addition to the primary mission of academic and vocational instruction, the community colleges shall offer instruction and courses to achieve all of the following: [¶] (A) The provision of remedial instruction for those in need of it and, in conjunction with the school districts, instruction in English as a second language, adult noncredit instruction, and support services which help students succeed at the postsecondary level are reaffirmed and supported as essential and important functions of the community colleges." (Ed. Code, § 66010.4, subd. (a)(2).) Thus, even assuming for the sake of argument that the District had violated this section of the Education Code, it would not also be a violation of Article 6(E).

## DISPOSITION

The trial court's judgment of dismissal is affirmed.
Appellant Los Angeles College Faculty Guild to bear costs.

**CERTIFIED FOR PUBLICATION**

STRATTON, P. J.

We concur:

GRIMES, J.

WILEY, J.

19